Gen. 109]													109

**CRIMINAL LAW**

CONSTITUTIONAL LAW — STATUS OF PHYSICIAN-ASSISTED SUICIDE UNDER CURRENT LAW — CONSTITUTIONALITY OF A STATUTE TO PROHIBIT ASSISTED SUICIDE

September 8, 1993

*The Honorable Ronald A. Guns*
*Maryland House of Delegates*

You have requested our opinion concerning physician-assisted suicide in Maryland. Specifically, you pose the following questions:

1.    Does current Maryland law impose criminal sanctions on a physician or other health care provider who, like Dr. Kevorkian in Michigan, knowingly and intentionally supplies the means by which an individual takes his or her own life?

2.    If physician-assisted suicide is not now clearly a crime, would a statute making it an offense be constitutional?

For the reasons stated below, we conclude as follows:

1.    Assisted suicide, whether the assistance is rendered by a physician or someone else, is probably a common law crime in Maryland – specifically, accessory before the fact of a felony or second degree principal to a felony – but the question is not at all free from doubt. Even more doubtful is whether a charge of homicide could be successfully prosecuted. Finally, a physician or other person who supplied the means for another's suicide might be guilty of the statutory misdemeanor of reckless endangerment, although prosecution of that lesser offense is also somewhat problematic.

2.    The General Assembly is not precluded by the United States or Maryland Constitution from enacting a statute prohibiting assisted suicide and thereby resolving the uncertainty under current law. And, as a policy matter, we believe that the General Assembly should act promptly to pass such a statute. To

that end, this office will propose legislation for consideration in the 1994 Session.

# I

## Background

The recent spate of suicides in Michigan assisted by Dr. Jack Kevorkian has brought to the forefront of public attention the issue of physician-assisted suicide.[1] Dr. Kevorkian's activities — fashioning "suicide machines" by which an individual could inhale a lethal amount of carbon monoxide or take a lethal dose of an intravenous medication – were given a strong impetus by trial court rulings that assisted suicide was not a crime in Michigan. In response, the Michigan Legislature enacted an emergency statute prohibiting assisted suicide. *See* Part III below.

Maryland is one of a minority of states in which no statute prohibits assisted suicide directly.[2] Although we have no reason

---

[1] According to press accounts, Kevorkian, a retired pathologist whose medical license has been suspended, "has helped 17 people end their lives in the last three years ...." *Washington Post*, August 18, 1993, at 1, col. 3. Kevorkian, who conducts his activities outside any medical facility, is widely viewed by physicians and bioethicists as a misguided zealot. Yet other, far more respectable voices in the medical community have argued that physician-assisted suicide is an ethical form of patient care in some circumstances. *See, e.g.*, T. Quill, *Death and Dignity* 138-65 (1993); Gostin, *Drawing a Line Between Killing and Letting Die: The Law, and Law Reform, on Medically Assisted Dying*, 21 J. of Law, Med. & Ethics 94 (1993); Wanzer *et al., The Physician's Responsibility Toward Hopelessly Ill Patients: A Second Look*, 320 New Eng. J. of Med. 844 (1989).

[2] A recent law journal article cites statutes from 30 states "imposing criminal sanctions for aiding, assisting, causing, or promoting suicide." CeloCruz, *Aid in Dying: Should We Decriminalize Physician-Assisted Suicide and Physician-Committed Euthanasia?*, 18 Am. J. of Law & Med. 369, 377 n.61 (1992). The author cites five other states that "impose such criminal penalties under case law." *Id.* Interestingly, a similar survey six years earlier listed 22 states as prohibiting assisted suicide by statute. Note, *Criminal Liability for Assisting Suicide,* 86 Col. L. Rev. 348, 353 (1986). Thus, the trend in the states is to enact laws of this kind. House

(continued...)

to suppose that the incidence of physician-assisted suicide is greater in Maryland than elsewhere,[3] the absence of a statute raises the question whether a Dr. Kevorkian in Maryland would be subject to prosecution. Part II of this opinion explores the uncertainties of that question. Part III concludes that, if the General Assembly wishes to resolve the uncertainty, it is constitutionally free to do so.

When we speak of "assisted suicide" in this opinion, we mean instances in which a physician knowingly and intentionally *provides the means* by which a patient performs a life-ending act. If the physician knowingly and intentionally *performs* the life-ending act — for example, by administering a lethal injection — the physician will, without question, be chargeable with murder. *See In re Joseph G.*, 34 Cal. 3d 429, 194 Cal. Rptr. 163, 167 (1983).

We emphasize that we are not here discussing legally authorized decisions to forgo life-sustaining medical treatment in order to allow a course of disease to end in death naturally. The new Health Care Decisions Act, Chapter 372 of the Laws of Maryland 1993 (effective October 1, 1993), addresses comprehensively the rights and responsibilities of patients, health care agents, surrogates, health care providers, and courts when the issue is the withholding or withdrawal of a life-sustaining procedure. *See generally* 78 *Opinions of the Attorney General* 208 (1993). Under the Health Care Decisions Act, "[t]he withholding or withdrawal of life-sustaining procedures in accordance with the provisions of this subtitle shall not, for any purpose, constitute a suicide." §10-614(a) of the Health-General Article, Maryland Code ("HG" Article).

Conversely, the Health Care Decisions Act expressly disclaims any authorization of active euthanasia or assisted suicide: "Nothing

---

[2] (...continued)
Bill 948 of the 1987 Session would have done so in Maryland, but the bill was defeated.

[3] One newspaper report cites survey evidence that one in five Massachusetts physicians who treat terminally ill patients has been asked to assist a suicide; of the physicians who were asked, 19 percent said that they actually did so. *Boston Globe*, April 26, 1993, at 1.

in this subtitle may be construed to condone, authorize, or approve mercy killing or euthanasia, or to permit any affirmative or deliberate act or omission to end life other than to permit the natural process of dying." HG §10-611(c). Yet the new law itself leaves open the question whether assisted suicide − surely an instance of a "deliberate act ... to end life ..." − is otherwise unlawful. To that question we now turn.

# II

## Assisted Suicide Under Current Law

### *A.    Introduction*

Suicide was a common law felony. *Wilmington Trust Co. v. Clark*, 289 Md. 313, 328, 424 A.2d 744 (1981); 4 W. Blackstone, *Commentaries*  * 189; Clark & Marshall, *A Treatise on the Law of Crimes* §10.03 (7th ed. 1967). Thus, under the common law, "if one counsels another to commit suicide, and the other by reason of the encouragement and advice kills himself, the adviser was guilty of murder as an aider and abettor, provided he was present when the advice was carried out; but if he was not present he was a mere accessory before the fact, and escaped punishment because of the impossibility of his principal being tried first and convicted." *Commonwealth v. Hicks*, 82 S.W. 265 (Ky. 1904).[4]

Article 5 of the Maryland Declaration of Rights provides: "That the inhabitants of Maryland are entitled to the Common Law of England ...." A determination that assisting a suicide was a crime at common law, however, does not end the inquiry. "It is true that the common law of England has been adopted by the people of this State, but only so far as it could be made to fit and adjust itself to our local circumstances and peculiar institutions." *Denison v. Denison*, 35 Md. 361, 378 (1872). Whether the common law offense of assisting a suicide remains viable is a problem that one commentator called "as confusing a question as the law can present." Comment, *The Crime of Aiding a Suicide*, 30 Yale L.J. 408 (1921).

---

[4] This anomaly about the trial of accessories before the fact under Maryland law is discussed in note 5 below.

### B.    *Status of Suicide*

The threshold question is whether the Court of Appeals would decide that suicide is still an indictable offense in Maryland. If that answer is affirmative, the answer to the question whether assisted suicide is a crime is fairly straightforward. Under the common law, one who assists a suicide would be liable as an accessory before the fact or a second degree principal.[5] If, however, the Court of Appeals does not recognize suicide as a crime, there remains a question whether a person who assists a suicide nevertheless could be indicted on another charge.

According to Blackstone, the crime of suicide at common law was "a peculiar species of felony, a felony committed on one's self. And this admits of accessories before the fact, as well as other felonies; for if one persuades another to kill himself, and he does so, the adviser is guilty of murder." 4 *Commentaries* * 189. Under the common law, the felony of suicide was punishable by ignominious burial on the highway and forfeiture of the suicide's goods and chattels to the king. R. Perkins, *Criminal Law* 120 (2d ed. 1982).

Suicide is no longer punishable. The punishment of forfeiture of an estate for a crime has been prohibited in Maryland since the Constitution of 1776. Article 27 of the Declaration of Rights contains the current prohibition. The fact that the crime is no longer punishable, however, does not necessarily mean that suicide is no longer a crime. In fact, the scant authority on the issue suggests that, at the very least, the question remains open, at least when the issue is not suicide alone but rather assisted suicide.

Few state courts have been called upon to decide, in the absence of a specific statute, whether assisting suicide is a crime.

---

[5] An accessory before the fact, although not present at the commission of the crime, nevertheless has aided, abetted, counseled, or encouraged its commission. In 1979, Maryland abolished the common law rule that required the principal to be convicted before the accessory could be prosecuted. This development in the law eliminates the possibility that one who assists a suicide would escape prosecution because the principal could never be convicted. A principal in the second degree is one who is present and aids and abets the crime. R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* §§ 21.0 and 21.7, at 225 and 234 (1983).

The cases for the most part concluded that suicide was a crime, and therefore that it was criminal to assist a suicide. In *Commonwealth v. Hicks*, 82 S.W. 265 (Ky. 1904), for example, the court held that suicide was still a crime, a form of murder, although unpunishable, and that an aider or abettor should be treated just like any other aider or abettor of murder.[6] To like effect is *McMahan v. State*, 53 So. 89 (Ala. 1910). *See also Stephenson v. State*, 179 N.E. 633 (Ind. 1910) (defendant convicted of second degree murder for having kidnapped and raped a woman, thus driving her to commit suicide); *Commonwealth v. Bowen*, 13 Mass. 356 (1816) (inmate who encouraged another to commit suicide could be liable as principal). *But see Grace v. State*, 44 Tex. Crim. 193, 69 S.W. 529, 530 (1902) (because suicide was not illegal in Texas, "the punishment of persons connected with suicide, by furnishing the means or other agencies, does not obtain ...").[7]

The Maryland Court of Appeals has never addressed the question of assisted suicide. The Court has assumed in dicta, however, that the necessary predicate − that suicide itself remains a crime − is still true.

In *Wilmington Trust Co. v. Clark*, a divorcee brought an action against the personal representative of her husband's estate, claiming that her ex-husband impliedly breached their separation agreement by committing suicide. The Court of Appeals observed as follows: "For the purposes of this decision, we shall assume without deciding that suicide is a criminal or unlawful act in ... Maryland." 289 Md. at 321 n.5. In this passage, the Court cited a law review comment in which the author opined that in "Maryland, ... suicide is still without a doubt an unlawful act, even though the act itself is not punishable." Comment, *Criminal Liability of Participants in Suicide: State v.*

---

[6] At the time of the decision, Kentucky had abrogated the common law rule that the accessory could not be tried until the principal was convicted. In 1974 all common law offenses in Kentucky were abolished, and we are not aware of a statutory enactment that criminalizes suicide or assisted suicide in that state.

[7] Texas later enacted a statutory prohibition of assisted suicide. Tex. Penal Code Ann. §22.08.

*Williams*, 5 Md. L. Rev. 324, 326 (1941).[8]  *See also* Marzen, O'Dowd, Crone, & Balch, *Suicide: A Constitutional Right?*, 24 Duq. L. Rev. 1, 179 (1985) (hereafter cited as "*Suicide*").

Suicide was originally considered to be one of the "highest crimes," because "no man hath a power to destroy life but by commission from God, the author of it: and, as the suicide is guilty of a double offence; one spiritual, in invading the prerogative of the Almighty and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects ...." Blackstone, 4 *Commentaries* at * 189.  At least one of these justifications for declaring suicide to be a crime is doubtless obsolete; "spiritual" offenses do not give rise to penal sanction in contemporary American society.  But the State, like the king, does have an interest in preventing suicide.  Many cases that discuss a patient's right to decline life-sustaining medical treatment, including the leading case in Maryland, mention a state interest in the prevention of suicide.  *See Mack v. Mack*, 329 Md. 188, 211 n.7, 618 A.2d 744 (1993).  *See also Cruzan v. Director, Missouri Dep't of Rehab.*, 497 U.S. 261, 280 (1990).

Additionally, the modern trend is toward criminalizing assisted suicide while at the same time decriminalizing suicide.  Perkins, *Criminal Law* at 120; Kamisar, *Are Laws Against Assisted Suicide Unconstitutional?*, Hastings Center Rep., May-June 1993, at 33.[9] The rationale behind these prohibitions was expressed by the

---

[8] This comment was written to discuss an Anne Arundel County Circuit Court decision holding a survivor of a suicide pact guilty of murder in the second degree. *State v. Williams*, Circuit Court for Anne Arundel County (per Melvin, J.).  *See The Daily Record*, November 27, 1940.  According to the author, the court sidestepped the defendant's contention that suicide was no longer a crime in Maryland and ruled instead that the defendant was indicted not because of the suicide aspect of the case, but on the theory that he actively participated in causing the deceased's death, independent of her own self destruction.  However, the court by dictum did point out that while suicide is no longer punishable in this country or in England, it is still regarded as unlawful and criminal, since it was a common law crime that was adopted in Maryland and not subsequently changed by statute or judicial decision.  Perhaps because the court suspended the entire sentence, the case was not appealed.

[9] *See* note 2 above.

commentators to the Model Penal Code when they proposed §210.5, the prohibition against causing or aiding suicide. Recognizing that penal sanctions will not deter the suicide itself, the drafters pointed out that this fact "does not mean that the criminal law is equally powerless to influence the behavior of those who would aid or induce another to take his own life." Furthermore: "[I]n principle it would seem that the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request of the suicide victim." American Law Institute, *Model Penal Code and Commentaries, Part 1*, §210.5 at 100.

In *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979), the Court of Appeals, in considering whether the common law crime of misprision of a felony remained viable, thought it significant that the Maryland Commission on Criminal Law in its proposed criminal code of 1972 did not include the crime. In contrast, that same commission did propose a statutory crime of promoting suicide.[10] Applying this aspect of *Pope*, the Court of Appeals may consider the fact that assisting suicide was proposed as a crime as support for finding that the common law offense remains viable. In other words, the contemporary policy objective sought to be achieved by the Commission is a basis for retaining the common law offense.

Although suicide may have lain dormant as a criminal offense for years, can it be said definitively that the rule criminalizing suicide has become "unsound in the circumstances of modern day life"? *White v. King*, 244 Md. 348, 354, 223 A.2d 763 (1966).[11] Not

---

[10] Depending on the facts, the crime was either murder or manslaughter. See Proposed Criminal Code §120.35 (1972) and Item No. 6-13, Legislative Council of Maryland Report (November 25, 1974). The Commission proposed a new volume of the Maryland Code, entitled "Criminal Law," which was intended to codify all crimes and abolish common law offenses.

[11] As the Court of Appeals long ago observed: "If there had never been in Maryland, since the original settlement of the colony by our ancestors, a prosecution for murder [or] arson, ... and consequently no judicial adoption of either of these branches of the common law, could it therefore be contended, that there was no law in the State for the

(continued...)

when one considers the activities of a Dr. Kevorkian. These very "circumstances of modern day life," discussed in more detail in Part III below, may warrant revitalizing the crime of suicide and, concomitantly, assisted suicide. In short, the Court of Appeals might well conclude that, "overall, the welfare of the inhabitants of Maryland and society as enjoyed by us today" would be served by the recognition of the common law crime of suicide. *Cf. Pope*, 284 Md. at 352 (rejecting common law crime of misprision of a felony as no longer acceptable under current standards). *See also Williams v. State*, 77 Md. App. 411, 550 A.2d 722 (1988) (recognizing viability of common law "born alive" rule in homicide case).

## C.    *Other Possible Sanctions*

### 1.    <u>*Homicide*</u>

If the Court of Appeals were to reject the common law crime of suicide, it would be much more difficult to prosecute a physician or other person who intentionally assisted a suicide. One cannot be charged with criminally aiding and abetting an act that is not itself a crime.

It is doubtful, moreover, whether someone who supplied the means for suicide but did not personally administer the means of death would be guilty of criminal homicide. "At the common law, to which the inhabitants of Maryland are entitled, ... homicide is the killing of a human being by another human being ...." *Jackson v. State*, 286 Md. 430, 435, 408 A.2d 711 (1979). "The basic premise," the Court continued, "is that '[a] person is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted.'" 286 Md. at 441 (citation omitted).

Perhaps it can be argued that the causation element of criminal homicide is satisfied because, but for the physician's supplying of the means, the death would not have occurred — "'that the result would not have happened in the absence of the conduct; or, putting it another way, that "but for" the antecedent conduct the result would

---

[11] (...continued)
punishment of such offenses?" *State v. Buchanan*, 5 H. & J. 317, 358 (1821).

not have occurred.'"  286 Md. at 442 (quoting W. LaFave and A. Scott, *Handbook on Criminal Law* 249 (1972)).  The Court's acceptance of this "but for" analysis, however, was in the context of a death that occurred during the commission of a felony.[12]  In a case of physician-assisted suicide, by contrast, the physician will not have committed a felony that set in motion the events leading to the patient's death.  Moreover, the subsequent act of the patient in using the means of suicide might be viewed as an "independent supervening cause" sufficient to break the causative link to the physician.[13]

The courts in several old cases seek to avoid the causation issue by holding that the act of furnishing poison to a suicide brought the conduct within the scope of state statutes that prohibited murder by means of poison.[14]  In other words, the courts analyzed the cases as though the abettor were in fact the principal, using the suicide victim as an instrument of his or her own murder.  *See Burnett v. People*, 68 N.E. 505 (Ill. 1903); *Blackburn v. State*, 23 Ohio St. 146 (1872); *State v. Jones*, 67 S.E. 160 (S.C. 1910).

Whether the result-oriented reasoning of these cases would be adopted by the Maryland courts is questionable.  The difficulty is illustrated by two decisions from Dr. Kevorkian's state of choice, Michigan.  The first, *People v. Roberts*, 178 N.W. 690 (Mich. 1920), involved a husband who, at his ill wife's request, furnished poison to her.  The wife committed suicide with the poison.  The Michigan Supreme Court held that, although suicide was not a crime in Michigan, the husband nevertheless was guilty of murder as a principal.   More recently, however, Michigan's intermediate

---

[12] The defendants in *Jackson* took hostages to escape after a robbery. One of the hostages was killed by police gun fire at a roadblock.

[13] The phrase "independent supervening cause" comes from *DeVaughn v. State*, 232 Md. 447, 454-56, 194 A.2d 109 (1963), *cert. denied*, 376 U.S. 927 (1964), in which the Court of Appeals used that test to evaluate (and reject) the argument that a victim of a gunshot wound had died as a result of negligent care in the hospital, rather than the defendant's act of shooting the victim.

[14] In Maryland, all murder perpetrated by means of poison, or by lying in wait or by any kind of wilful, deliberate and premeditated killing is murder in the first degree.  Article 27, §407.

appellate court rejected the *Roberts* holding, stating it was no longer representative of the law of Michigan. In *People v. Campbell*, 335 N.W.2d 27 (Mich. App.), *app. denied*, 342 N.W.2d 519 (Mich. 1983), the court reversed an order denying a motion to dismiss an information that charged the defendant with murder arising out of his encouraging and assisting a suicide: "The term suicide excludes by definition a homicide. Simply put, the defendant here did not kill another person." 335 N.W.2d at 30.

In sum, a successful prosecution for murder when the defendant merely assisted a suicide is doubtful.

## 2. *Reckless Endangerment*

Article 27, §120(a) provides that any person who "recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of a misdemeanor of reckless endangerment ...."[15] The Court of Appeals considered this offense recently in *Minor v. State*, 326 Md. 436, 605 A.2d 138 (1992). In *Minor*, the defendant, who had been drinking with his brother, handed his brother a loaded shotgun and dared him "to play Russian roulette." The brother shot himself. The defendant claimed that he thought his brother was only bluffing and would return the shotgun without firing. The Court of Appeals held that the defendant's subjective intention was irrelevant; reckless endangerment was defined by statute in terms of the risk produced by the defendant's conduct, whatever the defendant's intent. The Court wrote: "It is the reckless conduct and not the harm caused by the conduct, if any, which the statute was intended to criminalize." 326 Md. at 442. The Court continued: "The test is whether the [defendant's] misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish." 326 Md. at 443.

It is difficult to predict whether the Court of Appeals would view the furnishing of a means of suicide by a doctor to an ill person as "so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe ...." This

---

[15] This misdemeanor is punishable by imprisonment not exceeding five years, a fine not exceeding $5,000, or both.

conduct is not really analogous to daring an intoxicated person to play Russian roulette with a shotgun. A physician who provides the means of death, intending that the patient use those means to carry out a planned suicide, is not "reckless" in the primary sense of that term: "careless, heedless, inattentive; indifferent to consequences." *Black's Law Dictionary* 1270 (6th ed. 1990). At the least, however, it would not be unreasonable for a State's Attorney to charge the offense under the appropriate circumstances, in light of the Court's interpretation of §120.

## III

### Constitutionality of an Assisted Suicide Statute

If the General Assembly were to join the states that have enacted statutes prohibiting assisted suicide, the most likely challenge would advance the argument that the right to commit suicide is a constitutionally protected privacy right or liberty interest. Advocates of a constitutional right to suicide primarily base their argument on the contention that the so-called "right to die" – that is, the right to decline life-sustaining medical treatment – is fundamentally the same as a right to commit suicide. *See, e.g.,* Comment, *Physician-Assisted Suicide and the Right to Die With Assistance*, 105 Harv. L. Rev. 2021 (1992).

We disagree. There is no constitutional right to commit suicide.

Up until the challenge, still in litigation, to the State of Michigan's recently passed law prohibiting assisted suicide, we are not aware of constitutional challenges to any other similar state statutes. The Michigan law was found to be void by the trial court

because it violated the Michigan Constitution's single-subject rule.[16] *Hobbins v. Attorney General*, No. 93-306-178 CZ (May 20, 1993).[17]

Venturing beyond this narrow ground of decision, the trial court judge went on to consider whether the two terminally ill patients who were plaintiffs in the lawsuit would prevail in their challenge to the constitutionality of the law. In a ruling rife with inconsistencies, the trial court held that, because the two patients had a "fundamental" right to die, they had a fundamental right to commit suicide. Slip op. at 16. The court appeared first to consider the right to commit suicide as a liberty interest but then, without explanation, concluded that it was a fundamental right and that the state therefore must have a compelling interest in order to interfere with that right. Slip op. at 20. The court stated that the "undue burden" test, articulated by the Supreme Court in *Planned Parenthood v. Casey*, 112 S.Ct. 2791 (1992), as the touchstone for the validity of state restrictions on abortion, should be applied to Michigan's assisted suicide statute, to determine whether it placed an undue burden on a handicapped person who might need assistance in committing suicide. Slip op. at 20.

In our opinion, this unique decision is simply wrong. There is no fundamental right to suicide. And, unlike the right to refuse unwanted medical treatment, suicide is not even a bare "liberty" interest within the scope of the Fourteenth Amendment.

First, the claim that suicide is a "fundamental right," based on the right to privacy is wholly without merit.[18] In *Griswold v.*

---

[16] The original bill created a commission to study the issue of criminalizing assisted suicide and was later amended to prohibit assisted suicide. The court held that the amendment amounted to a separate subject.

[17] On June 23, 1993, the Michigan Court of Appeals stayed the lower court order pending appeal. Subsequently,Dr. Kevorkian was charged under the new Michigan statute. *Washington Post*, August 18, 1993 at 1, col. 3.

[18] A claim that a "right to commit suicide" may be drawn from any provision of the Maryland Constitution would be equally without merit. *See generally* 74 *Opinions of the Attorney General* 19, 30 (1989).

*Connecticut*, 381 U.S. 479 (1965), the first Supreme Court decision to recognize the right of privacy, Justice Goldberg stated:

> In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather they must look to the "traditions and [collective] conscience of our people to determine whether a principal is "so rooted [there] ... as to be ranked as fundamental."

381 U.S. at 493 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105 (1934)).  Applying that approach in *Roe v. Wade*, 410 U.S. 113 (1973), the Court analyzed at length the history of societal and legal attitudes toward abortion before ultimately determining that the right to abortion was a fundamental right.

The weight of authority in the United States, from colonial days through the 1970's, has demonstrated a predominate social and legal attitude of opposition to suicide.  *Suicide,* 24 Duq. L. Rev. at 100.  Historically, this attitude was grounded in the religious belief that only God could end a life.  More recently, the predominate view reflects the state interest in the prevention of suicide, coupled with a belief that those who attempt suicide are in need of medical or psychiatric treatment.  Consequently, there is no historical basis for the contention that suicide is so rooted in our traditions as to be deemed a "fundamental" right.

Moreover, in *Cruzan*, the Supreme Court rejected the argument that the right to refuse medical treatment, a concept rooted in the common law, was a "fundamental" right included within the right to privacy.  497 U.S. at 279 n.7.  Rather, the right was assumed to be encompassed by the Fourteenth Amendment's protection of "liberty" interests.  497 U.S. at 279.[19]  The Court characterized the right to refuse medical treatment, including a life-sustaining medical procedure, as the logical corollary of the doctrine of informed consent.

---

[19] In *Mack v. Mack*, the Court of Appeals found no need to determine whether the right to refuse treatment was a constitutional right; its decision relied on a common law analysis.  329 Md. at 211.

As to suicide, however, the Court cited the fact that the majority of the states have laws imposing criminal sanctions on one who assists another in committing suicide as evidence of a state's interest in the preservation of human life. 497 U.S. at 280. Further, in balancing a competent person's constitutionally protected liberty interest in refusing life-sustaining medical treatment against the interests of the state, the Court accepted Missouri's assertion of "an unqualified interest in the preservation of human life." 497 U.S. at 281-82. The Court did not remotely suggest that the right to refuse treatment extended to the act of committing suicide.[20] In light of *Cruzan*, it is inconceivable that the Supreme Court would find suicide to be a fundamental right.

Additionally, other courts that have considered whether there is a constitutional right to suicide have consistently distinguished the right to refuse medical treatment from the right to commit suicide. The New Hampshire Supreme Court, in a case involving a prisoner's claimed right to starve himself to death, declared that:

> This is not a situation where an individual, facing death from a terminal illness, chooses to avoid extraordinary and heroic measures to prolong his life, albeit for a short duration. Rather, the defendant has set the death producing agent in motion with the specific intent of causing his own death, ... and any comparison of the two situations is superficial. Thus, in these circumstances, the State's interest in preserving life and preventing suicide dominates.

*In re Caulk*, 480 A.2d 93, 97 (N.H. 1984) (citation omitted). Similarly, the New Jersey Supreme Court distinguished between suicide and the refusal of medical treatment as follows:

> Declining life sustaining medical treatment may not properly be viewed as an attempt to commit suicide. Refusing medical

---

[20] Justice Scalia alone saw no significant difference between a refusal of life-sustaining treatment, on the one hand, and suicide, on the other. 497 U.S. at 295-300 (Scalia, J., concurring).

> intervention merely allows the disease to take its natural course: if death were eventually to occur, it would be the result, primarily, of the underlying disease, and not the result of a self inflicted injury.

*In re Conroy,* 486 A.2d 1209 (1985). *See generally McKay v. Bergstedt*, 801 P.2d 617, 625-27 (Nev. 1990) (distinguishing treatment refusal from suicide). *See also, e.g., Van Holden v. Chapman*, 450 N.Y.S.2d 623, 625 (1982) (to characterize a person's self destructive acts as entitled to constitutional protection would be ludicrous); *Department of Public Welfare v. Kallinger*, 134 Pa. Cmwlth. 415, 580 A.2d 887, 892 (1990) (to allow a prisoner to starve while the state stood by and watched would be asking the state to aid and abet suicide, which Pennsylvania law prohibits). *But see Zant v. Prevatte*, 286 S.E.2d 715 (Ga. 1982) (since prisoner was sane and rational, he should be permitted to starve himself).

The rationale of these cases is echoed by commentators who, arguing that refusal of medical treatment is fundamentally different from intended self-injury, conclude that court decisions allowing the withholding of medical treatment should not serve as precedents for the recognition of a constitutional right to suicide. *See* Orentlicher, *Physician Participation in Assisted Suicide*, 262 J.A.M.A. 1844, 1845 (1989); *Suicide*, 24 Duq. L.Rev. at 10.

For example, the law has always distinguished between acts and omissions in homicide; a person who shoots another would be guilty of homicide, but a physician who passes the scene of an accident knowing that a victim may die would not be guilty of any crime. *Id*. Thus, an omission, the withholding of medical of medical treatment, could be condoned by the law, whereas an act, the commission of suicide, could not. *See generally* Meisel, *The Right to Die* §1.8, at 14-15 (1989 & 1992 Supp.).

We think it most unlikely that any appellate court would ignore the well-grounded distinction between a refusal of unwanted medical treatment and suicide. Consequently, we do not think that a court would find a protected liberty interest in committing suicide.

But even if there were a liberty interest in suicide, it does not follow that a law prohibiting assisted suicide would be unconstitutional. Should an appellate court find a constitutionally

protected liberty interest in a person's wish to commit suicide, such a holding would merely implicate the rational basis test as the appropriate standard with which to evaluate a due process challenge. Accordingly, a state need only demonstrate a rational reason for a statute that prohibits assisted suicide.

In our view, that test would be easily satisfied. To cite but one among many possible justifications, the General Assembly could decide that a prohibition on assisted suicide was needed to protect "[p]articularly vulnerable potential victims ... [including] the elderly, those frightened by illness, and the depressed of all ages" against abuse. Hendin and Klerman, *Physician-Assisted Suicide: The Dangers of Legalization*, 150 Am. J. Psychiatry 143, 144 (1993). The General Assembly is constitutionally free to prevent the development of "a climate in which both subtle and obvious forms of duress would cause many who would not otherwise do so to choose suicide ...." *Suicide*, 24 Duq. L. Rev. at 108. *See generally Donaldson v. Van de Kamp*, 4 Cal. Rptr. 2d 59, 64-65 (Cal.App. 1992).

The General Assembly can also act to safeguard the medical profession against the harm resulting from slowly growing acceptance of physician-assisted suicide. "[I]f physicians become killers or are even merely licensed to kill, the profession ... will never again be worthy of trust and respect as healer and comforter and protector of life in all its frailty. For if medicine's power over life may be used equally to heal or to kill, the doctor is no more a moral professional but rather a morally neutered technician." Gaylin et al., *Doctors Must Not Kill*, 259 J.A.M.A. 2139 (1988).[21]  As the

---

[21] And, we might add, the "technician" might be wrong even on technical grounds:

[N]o matter how carefully made, at least a few predictions as to progression of disease, lack of response to treatment, or impossibility of palliation will be proven wrong.... The[se] mistakes ... would be buried. But this does not eliminate the fact that, though it would be impossible to identify them, if physician-assisted suicide were a common practice, some patients who would die would otherwise have defied medical expectation.

(continued...)

Ethics and Health Policy Counsel of the American Medical Association put it:

> What the sick need and are entitled to seek from the efforts of physicians is health. Accordingly, physicians provide medical treatments to the sick to make them well, or as well as they can become. Treatment designed to bring on death, by definition, does not heal and is therefore fundamentally inconsistent with the physician's role in the physician-patient relationship.

Orentlicher, *Physician Participation in Assisted Suicide*, 262 J.A.M.A. at 1845.[22]

Most fundamentally, the General Assembly is constitutionally free to reaffirm in this way the State's interest in the preservation of life. The General Assembly may accept, and give concrete meaning to, this observation of Nancy Dubler, a leading bioethicist: "If we as a society acquiesce in the commonplace termination of life, we have taken a profound moral step away from the sanctity of life." N. Dubler and D. Nimmons, *Ethics on Call* 171 (1993).

## IV

## Conclusion

Even under current law, a Dr. Kevorkian in Maryland would face prosecution. We have explained why we think that assisted suicide remains a common law crime, but we cannot be certain about it. This uncertainty is troubling in an area where clear legal ground

---

[21] (...continued)
Dinwiddie, *Physician-assisted Suicide: Epistemological Problems*, 11 Med. & Law 345, 351 (1992).

[22] Indeed, physicians might play a subtly coercive role: "The physician's personal values might also play a role in encouraging or discouraging the patient, subtly or otherwise, to consider assisted suicide as an option. The physician's judgment and readiness to consider assisting in suicide might also be influenced by his or her feelings toward the patient and the patient's family." Dinwiddie, *Physician-assisted Suicide: Epistemological Problems*, 11 Med. & Law at 351.

rules are particularly important. Certainty can be achieved if the General Assembly enacts a statute on the subject, which it is constitutionally free to do.

We believe that, as a policy matter, a carefully drafted prohibition ought to be enacted.[23] We shall be developing a proposal for legislative consideration at the 1994 Session of the General Assembly.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*

Mary O'Malley Lunden
*Assistant Attorney General\**

\*Amanda Stakem Conn, a volunteer intern in the Opinions & Advice Division, contributed substantially to the development of this opinion.

*Editor's Note:*

The Supreme Court has upheld the constitutionality of state criminal prohibitions of assisted suicide. *Washington v. Glucksberg*, 117 S. Ct. 2258 (1997), and *Vacco v. Quill*, 117 S. Ct. 2293 (1997).

---

[23] Any statute on physician-assisted suicide should be circumscribed to avoid interference with proper patient care. A physician who in good faith prescribes an analgesic to a patient, intending not to hasten death but to relieve pain, should not have to worry about prosecution under an assisted suicide statute. Minnesota, for example, recently amended its assisted suicide statute in an attempt to lessen any detrimental effect on legitimate medical practice. *See* Minn. Stat. Ann. §609.215(3)(b).